F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**AUG 28 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

DARIEL D. HINSDALE, a/k/a Tom Hinsdale;
GRACE A. HINSDALE,

     Plaintiffs-Appellants,

THOMAS G. ANDERSON; ROBERT E.
BENTON; VIRGINIA P. BENTON, Executrix
of the Estate of Robert E. Benton,

     Plaintiffs,

v.

CITY OF LIBERAL, KANSAS; JOE
BRIDENBURG; GEORGE A. HERRMAN,
a/k/a Tony Herrman; LARRY KOOCHEL;
DEBBIE S. GISKIE; RON THORNBURG,
individually and in their official capacities,

     Defendants-Appellees.

No. 00-3087
(D. Kan.)
(D.Ct. No. 96-CV-1249)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HOLLOWAY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**JONES**,[**] Circuit Judge.

_____

   [*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

   [**] The Honorable Nathaniel R. Jones, United States Circuit Judge for the Sixth
Circuit, sitting by designation.

Plaintiffs Dariel D. ("Tom") Hinsdale and Grace Hinsdale are husband and wife. Tom Hinsdale appeals the district court's decision to grant summary judgment to defendants on his: (1) retaliation claim under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"); (2) freedom of association claim under the First and Fourteenth Amendments; (3) procedural due process, substantive due process, and equal protection claims under the Fourteenth Amendment; and (4) conspiracy claims pursuant to 42 U.S.C. § 1985. Grace Hinsdale appeals the district court's conclusion she does not have Article III standing to assert a freedom of association claim under the First and Fourteenth Amendments. Exercising jurisdiction under 28 U.S.C. § 1291, [1] we reverse in part and affirm in part.

I. Background

Defendant City of Liberal, Kansas ("City) operates under the commission-manager plan set forth in Kan. Stat. Ann. § 12-1001 et seq. "The administration

---

[1] The district court's summary judgment ruling was not an appealable final order because it denied defendant Ron Thornburg's summary judgment motion on plaintiffs Thomas Anderson's and Virginia Benton's substantive due process claims. After Tom and Grace Hinsdale filed their notice of appeal, the district court dismissed Mr. Anderson's and Ms. Benton's claims with prejudice by stipulation of the parties. As of that date, the Hinsdales' notice of appeal ripened, and "we will consider the appeal on its merits rather than dismiss for lack of jurisdiction." *Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) (en banc).

of the city's business shall be in the hands of a manager. The manager shall be appointed by the commission, and shall hold office at the pleasure of the board." Kan. Stat. Ann. § 12-1011; *see Riddle v. City of Ottawa*, 754 P.2d 465, 469 (Kan. Ct. App. 1988). "The manager shall be responsible for the administration of all of the affairs of the city. He or she shall see that the laws and ordinances are enforced. The manager shall appoint and remove all heads of departments, and all subordinate officers and employees of the city." Kan. Stat. Ann. § 12-1014; *see Riddle*, 754 P.2d at 469.

Defendants Larry Koochel, Joe Bridenburg, and George A. Herrman were three of the five members of the City Commission ("Commission") at all times relevant to this case. Laverne Lee Courtney and Ivanhoe Love, Jr. were the other two members of the Commission during this same period. Richard Olson was City Manager from April 1993 through October 1994. Defendant Debra Sue Giskie was Acting City Manager from October 1994 through May 1995. Stanley H. Wilbers was City Finance Director from November 1989 to January 1995.

"When we review a summary judgment, we resolve all factual disputes, and draw all inferences, in favor of the party against whom judgment was granted." *Morfin v. Albuquerque Pub. Schs.*, 906 F.2d 1434, 1436 (10th Cir. 1990).

Viewed in this light, the relevant events follow. [2]

Mr. Hinsdale became the City's Chief of Police in 1987. In May 1993, Grace Hinsdale filed a FLSA lawsuit against the City and its Housing Authority, by and with whom she had been employed, claiming she was due unpaid overtime compensation. One year later, the Commission and Mr. Olson became aware that Mr. Hinsdale would testify in his wife's FLSA lawsuit on her behalf. Specifically, on May 17, 1994, the Commission discussed this development in an executive session following its public meeting. On approximately July 3, 1994, Mr. Olson presented two employment options to Mr. Hinsdale: (1) resign with six months severance pay and a favorable recommendation; or (2) be demoted [3] to the newly created Court Administrator position, take a more than $6,000 pay cut, and retire as soon as he was eligible under the Kansas public employee retirement system. On July 10, 1994, Mr. Hinsdale selected the second option, which went into effect immediately. Mr. Hinsdale testified by deposition in his wife's FLSA lawsuit on August 12, 1994.

---

[2] We address the relevant facts surrounding these events in our analysis of each cause of action on appeal. *See infra* Part III.

[3] Although the district court and defendants refer to this as a "transfer," Mr. Olson clearly testified he "demoted" Mr. Hinsdale.

In October 1994, the Commission fired Mr. Olson, and made Ms. Giskie Acting City Manager. On January 18, 1995, Ms. Giskie presented two options to Mr. Hinsdale with one week to decide between them: (1) be fired; or (2) resign with a severance package. Two days later, at Mr. Hinsdale's request, Ms. Giskie put her reasons for the adverse employment action in writing. Soon thereafter, Mr. Hinsdale was admitted to the hospital for some surgery. Upon the completion of his sick leave, Mr. Hinsdale was terminated from the City's employment on March 20, 1995.

The Hinsdales' second amended complaint reflects the proverbial "shotgun" approach to litigation. Mr. Hinsdale sued various groupings of defendants claiming retaliation under the FLSA, 29 U.S.C. § 215(a)(3); violations of his rights to freedom of speech, freedom of association, procedural due process, substantive due process, and equal protection under 42 U.S.C. § 1983; conspiracy to interfere with his civil rights under 42 U.S.C. § 1985; and breach of an implied contract of employment, tortious interference with an employment contract, defamation, and breach of fiduciary duty under state law. Grace Hinsdale sued two groupings of defendants claiming violations of her rights to freedom of association and equal protection under § 1983, and conspiracy to interfere with her civil rights under § 1985. The district court

granted defendants' summary judgment motion with respect to all of the Hinsdales' claims.

On appeal, Mr. Hinsdale claims the district court erred in concluding he: (1) failed, with regard to his FLSA retaliation claims, (a) to establish a prima facie case as to his demotion, and (b) to present sufficient evidence of pretext to rebut defendants' explanation as to why he was terminated; (2) failed to establish a jury question on causation as to his freedom of association claim; (3) was afforded federal procedural due process as to his termination; (4) was not denied substantive due process as to his demotion and termination; (5) abandoned his equal protection claim; (6) abandoned his § 1983 claims against the City; and (7) only raised a claim pursuant to 42 U.S.C. § 1985(3) and did not present sufficient evidence of the existence of a conspiracy. He also argues generally that Messrs. Koochel, Bridenburg and Herrman are not entitled to absolute legislative or qualified immunity for their actions taken in this case, and Ms. Giskie is not entitled to qualified immunity. Finally, Grace Hinsdale claims the district court erred in concluding she did not have Article III standing to assert her freedom of association claim.

II. Standard of Review

We review the grant of summary judgment *de novo* utilizing the standard described in Rule 56(c) of the Federal Rules of Civil Procedure. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Under this standard, we view the evidence and draw reasonable inferences in the light most favorable to the nonmovant. *See Adler*, 144 F.3d at 670.

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir. 1997). A movant that does not bear the burden of persuasion at trial satisfies its initial burden on a motion for summary judgment by pointing out to the court the lack of evidence for the nonmovant on an essential element of the nonmovant's claim. *See Adler*, 144

F.3d at 670-71. The burden then shifts to the nonmovant, who must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (quoting Fed. R. Civ. P. 56(e)). "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial." *Id.* at 670.

## III. Discussion

### A. Fair Labor Standards Act Retaliation Claims [4]

Mr. Hinsdale claims he was removed as Chief of Police and then terminated as Court Administrator by defendants in retaliation for both his decision to testify, and actual testimony, in support of his wife's FLSA lawsuit against the City. The FLSA states "it shall be unlawful for any person ... *to discharge or in any other manner discriminate against* any employee because such employee ... has testified or *is about to testify* in any [FLSA] proceeding." 29 U.S.C. § 215(a)(3) (emphasis added).

---

[4] In this section, "defendants" refers to Mr. Koochel, Mr. Bridenburg, Mr. Herrman, Ms. Giskie, and the City.

We have consistently held the adverse employment action "is unlawful only if it would not have occurred *but for* the retaliatory intent." *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997) (emphasis in original; quotation marks and citation omitted). "Thus, the mere existence of a non-retaliatory motive that would justify an employee's discharge does not absolve an employer of liability for a retaliatory employment decision; rather, the employer must *actually rely* on that nonretaliatory reason as the sufficient, motivating reason for the employment decision." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1484 (10th Cir. 1996) (emphasis in original). *cert. denied*, 520 U.S. 1186 (1997). We apply the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to FLSA retaliation claims as follows: (1) the plaintiff must establish a prima facie case of retaliation; (2) the employer then must proffer a legitimate reason for the adverse employment action; and (3) once the employer does so, the plaintiff must show there is a genuine issue of material fact as to whether the employer's proffered reason is pretextual. *See Conner*, 121 F.3d at 1394.

> To establish a prima facie case of FLSA retaliation, a plaintiff must show that: (1) he or she engaged in activity protected by the FLSA; (2) he or she suffered adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection existed between the employee's activity and the employer's adverse action.

*Id.*

> The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the [adverse employment action]; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.

*EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (footnote omitted).

To avoid summary judgment once the defendant meets its burden, the plaintiff is "required to produce evidence that [the adverse employment action] was in retaliation for his protected FLSA activity, either through the use of direct evidence or by showing that [the defendant's] proffered non-retaliatory reasons for terminating him were pretextual." *Conner*, 121 F.3d at 1396. "A plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable factfinder could rationally find unworthy of credence." *Richmond*, 120 F.3d at 209 (quotation marks, alterations, and citation omitted).

1. Demotion from Chief of Police to Court Administrator

Devendants claim the district court correctly held Mr. Hinsdale failed to establish a prima facie case of retaliation as to his removal from the Chief of Police position. The district court's ruling is premised on its conclusion that Mr. Hinsdale engaged in FLSA protected activity "by testifying in his wife's FLSA

case." The court held, however, Mr. Hinsdale did not suffer an adverse action by the City subsequent to or contemporaneous with his deposition testimony, because his demotion to Court Administrator preceded the date of his testimony. Further, the court concluded Mr. Hinsdale failed to show a causal connection between his support for his wife's case and the demotion, because "[Mr.] Olson's decision was his alone based upon his opinion about what was best for the city."

On appeal, Mr. Hinsdale claims the district court incorrectly limited the scope of protected activity to the date of a person's testimony in a FLSA proceeding, and this error undermines the court's subsequent conclusions that he failed to satisfy the second and third elements of his prima facie case. He argues the court should have held his decision to testify in his wife's FLSA lawsuit constituted the protected activity, and the temporal proximity between the date the Commission and Mr. Olson learned of that decision and the date Mr. Olson presented him with his removal as Chief of Police establishes his prima facie case. We agree.

The plain language of § 215(a)(3) protects a person whose testimony is impending or anticipated, as well as one who has already testified, in a FLSA proceeding. *See* 29 U.S.C. § 215(a)(3) (an employer is prohibited from

-11-

discriminating against an employee "because such employee ... has testified or *is about to testify* in any [FLSA] proceeding" (emphasis added)); *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 365 (4th Cir. 2000) ("While it is enough that the *testimony* be impending or anticipated, it is not enough that the *proceeding* be impending or anticipated; it must be 'instituted.'" (emphasis in original)). We conclude Mr. Hinsdale engaged in protected activity when he decided to testify in his wife's instituted FLSA lawsuit. It is undisputed Mr. Hinsdale suffered an adverse employment action subsequent to this decision.[5] Mr. Hinsdale thus established the first two elements of his prima facie case.

To satisfy the third element of a prima facie case, "the causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Conner*, 121 F.3d at 1395 (quotation marks and citations omitted). We first

---

[5] "The Tenth Circuit liberally defines the phrase 'adverse employment action.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (citing cases). We conclude Mr. Olson's presentation to Mr. Hinsdale of the choice between forced retirement or demotion to Court Administrator with a pay cut and mandatory retirement date constituted an adverse employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

compare the date the Commission and Mr. Olson became aware of Mr. Hinsdale's decision to testify in his wife's FLSA lawsuit, *see Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993), with the date of the adverse employment action. *See Anderson*, 181 F.3d at 1179. "[W]e have held that a one and one-half month period ... may, by itself, establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Drawing all inferences from the record in Mr. Hinsdale's favor, we conclude the Commission and Mr. Olson became aware of Mr. Hinsdale's decision at the May 17, 1994 Commission meeting, and the adverse employment action occurred on July 3, 1994. *See supra* Part I and note 5. This constitutes approximately a one and one-half month period, which demonstrates a causal connection under our established case law.

Accordingly, Mr. Hinsdale satisfied his burden to establish a prima facie case of retaliation regarding his demotion to Court Administrator. We reverse the district court's decision to grant defendants summary judgment on this claim, and remand for an evaluation of the evidence pursuant to the second and third stages of the burden-shifting analysis.

2. Termination from Court Administrator Position

The district court concluded Mr. Hinsdale established a prima facie case of

retaliation regarding his termination, and defendants articulated a legitimate reason for the termination: "the court administrator position was not funded." [6] At stage three of the analysis, the court held Mr. Hinsdale failed to produce "evidence by which a reasonable jury could believe that the defendants' proffered reason is pretextual ....  That the commissioners declined to fund the [Court Administrator] position does not change the fact that it was unfunded and [Ms.] Giskie cannot be held responsible for the commissioners' decision." Accordingly, the court granted defendants' summary judgment motion on this claim.

On appeal, Mr. Hinsdale argues there exist genuine issues of material fact whether the City's reason for his termination was pretextual.  Defendants claim Mr. Hinsdale did not establish the requisite causal connection for a prima facie case, and there was insufficient evidence to establish pretext.  We agree with Mr. Hinsdale.

---

[6] In their motion papers, defendants proffered two legitimate, non-discriminatory reasons for Mr. Hinsdale's termination:  "the position was unfunded in the budget and because of legitimate concerns about morale at the municipal court."  The district court's Memorandum and Order only addressed the "position was unfunded" reason, which is also the only reason Mr. Hinsdale and defendants focus on in their respective argument on appeal.  Accordingly, we will also only address the "position was unfunded" reason, and we express no opinion on the "concerns about morale" reason.

-14-

There is no question Mr. Hinsdale satisfied the first two elements of his prima facie case, because he (1) decided to, and did, testify in his wife's FLSA lawsuit by deposition, and (2) was terminated. Since over five months separate his deposition testimony [7] and termination, Mr. Hinsdale cannot establish causation by temporal proximity alone. *See Anderson*, 181 F.3d at 1179 ("[W]e have held that a three-month period, standing alone, is insufficient to establish causation."); *supra* Part I. Nonetheless, we agree with the district court that Mr. Hinsdale has provided sufficient additional "evidence of circumstances that justify an inference of retaliatory motive" to establish causation. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999) (quotation marks and citation omitted); *see Conner*, 181 F.3d at 1395 ("Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation.").

Viewing the evidence and drawing reasonable inferences in Mr. Hinsdale's favor, the record reflects the following additional evidence establishing

---

[7] We utilize the date of protected activity most favorable to Mr. Hinsdale in evaluating whether a causal nexus exists; here, the date of his deposition testimony, which occurred subsequent to his decision to testify. *See Anderson*, 181 F.3d at 1179; *supra* Part I.

-15-

causation. After Grace Hinsdale filed her FLSA lawsuit and before it became known Mr. Hinsdale would testify in it, Messrs. Koochel, Bridenburg, and Herrman separately told Mr. Olson that they "did not think it was right that a city employee's spouse would sue the City." Upon becoming aware that Mr. Hinsdale would testify in his wife's FLSA lawsuit, Mr. Love testified it "rubbed [Mr. Koochel] the wrong way" and Mr. Bridenburg stated "it was against the grain" and he "did not like it."

Mr. Wilbers provided a monthly summary to the Commission, listing the ongoing lawsuits involving the City along with the amount of legal fees incurred by the City for each suit. The City received its first bill for legal fees associated with Grace Hinsdale's FLSA lawsuit after the Commission became aware of Mr. Hinsdale's decision to testify in it. Messrs. Koochel, Bridenburg, and Herrman separately conveyed to Mr. Olson their negative reaction to the legal fees associated with Grace Hinsdale's FLSA lawsuit and their conclusion Mr. Hinsdale should be terminated. [8]

---

[8] Mr. Olson testified: (1) Mr. Koochel spoke with him at least twice about it, was "noticeably irate," and said Mr. Hinsdale should be terminated; (2) Mr. Bridenburg told him the fees were a "waste of money" and Mr. Hinsdale should be terminated; and (3) Mr. Herrman told him the money spent on fees "could be used for other purposes to benefit the citizens of Liberal," and "the city should cut its losses and get rid of [Mr.] Hinsdale."

During three executive sessions of Commission meetings, Mr. Koochel expressly stated to Mr. Olson that Mr. Hinsdale should be terminated because of his wife's FLSA lawsuit. In a separate conversation about Mr. Hinsdale's deposition testimony in his wife's FLSA lawsuit, Mr. Bridenburg told Mr. Olson that Mr. Hinsdale should be fired. Mr. Olson refused to fire Mr. Hinsdale, because Mr. Olson concluded he did not have a sufficient reason.

The Commission subsequently fired Mr. Olson by a three to two vote, with Messrs. Koochel, Bridenburg, and Herrman voting for, and Messrs. Courtney and Love voting against, his termination. [9] Subsequently, the Commission made Ms. Giskie Acting City Manager. Ms. Giskie told Mr. Courtney that "commissioners were putting a lot of pressure on her to terminate Tom Hinsdale and she said it was the usual ones," which Mr. Courtney assumed meant Messrs. Koochel, Bridenburg, and Herrman. Mr. Love testified he "felt [Ms. Giskie] was getting extreme pressure [to terminate Mr. Hinsdale] by the way she was reporting to the commission on [Mr.] Hinsdale's activities." Just before the January 18, 1995 termination meeting with Mr. Hinsdale, Ms. Giskie told Mr. Anderson that

_____

[9] Mr. Hinsdale concedes that Messrs. Koochel, Bridenburg, and Herrman each had their own separate, personal reasons for voting to terminate Mr. Olson. Mr. Hinsdale claims only Mr. Koochel wanted Mr. Olson terminated for his refusal to terminate Mr. Hinsdale.

-17-

Messrs. Koochel and Bridenburg "were pushing her to get rid of [Mr. Hinsdale]."

According to Mr. Hinsdale, Ms. Giskie told him during the January 18, 1995 termination meeting "this was not her idea, and that it was out of her control, making references that she was being pressured to take this action from the commission." Subsequently, Ms. Giskie met with Mr. Olson and told him she had been receiving pressure from one or more commissioners to terminate Mr. Hinsdale. Mr. Olson testified he said to Ms. Giskie: "[Y]ou did what they wanted you to do."

We conclude this evidence reflects: (1) the pressure Ms. Giskie received individually from Messrs. Koochel, Bridenburg, and Herrman was identical to the pressure each put on Mr. Olson – that is, to terminate Mr. Hinsdale because of his wife's FLSA lawsuit and his decision to testify in it; and (2) Ms. Giskie decided to terminate Mr. Hinsdale for the same retaliatory reasons motivating Messrs. Koochel, Bridenburg and Herman. Accordingly, we hold Mr. Hinsdale presented sufficient evidence to justify an inference of retaliatory motive, and thus establish a causal connection between his decision to testify, and actual testimony, in his

wife's FLSA lawsuit and his termination. [10]

Mr. Hinsdale does not challenge the district court's conclusion that defendants met their burden of proffering a legitimate, non-discriminatory reason for his termination: "The court administrator position was not funded." The issue we must now address is whether Mr. Hinsdale presented sufficient evidence to create a genuine issue of material fact as to whether the proffered reason is pretextual. *See Conner*, 121 F.3d at 1394. We note the proferred reason is susceptible to two interpretations: (1) insufficient money existed in the City's 1995 budgets to pay for Mr. Hinsdale's salary as Court Administrator; or (2) the "Court Administrator" position was not listed as a line item in any the City's 1995 budgets. Under either interpretation, we conclude Mr. Hinsdale has carried his burden of demonstrating pretext and is entitled to a trial on his claim. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the

---

[10] Defendants claim no such inference can be drawn in light of (1) Ms. Giskie's testimony that she did not believe she was receiving pressure from the commissioners to terminate Mr. Hinsdale, and (2) even if Messrs. Koochel, Bridenburg, and Herrman did pressure Ms. Giskie, there were various other reasons why they wanted Mr. Hinsdale terminated. However, on a motion for summary judgment, we may not make credibility determinations, weigh the evidence, or decide which inferences should be drawn from the evidence. *See Anderson*, 477 U.S. at 255.

-19-

employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Central to our evaluation of the evidence at this stage is the testimony of Mr. Wilbers:

> Well, when Tom [Hinsdale] was transferred [into the Court Administrator position], I was not aware that this was being considered or that [Mr.] Olson was going to do it. He did it and then I went in and raised the question as to how are we going to pay for this new position because we had not put it in the budget. And so he asked me to take a look at the general fund balances at that time, and I think this was in July. And he also explained that we're going to save some money over on the chief of police because we're going to have a position here that won't be filled for some time. And so I made an analysis of the 1994 expenditures and decided that we could – we had enough room in the general fund to fund that position for 1994 for those remaining months.

Regarding the first interpretation, we conclude the record contains evidence from which a reasonable factfinder could believe that the City had enough money to pay Mr. Hinsdale's 1995 salary. As Mr. Wilbers explained, Mr. Hinsdale's 1994 salary as Court Administrator was paid out of the "general fund," which contained both the police department and municipal court budgets. There was money available in the general fund due, in part, to the salary expense savings created by the vacancy in the police chief position. Based on the record before us and drawing all inferences in Mr. Hinsdale's favor, the City did not

hire a new police chief through at least the summer of 1995; instead, the City delegated the chief's duties to an existing City police officer. Accordingly, exactly the same situation existed at the beginning of 1995 as in the latter half of 1994 – *i.e.*, the City's police department budget had excess money because a new Chief of Police had not yet been hired, which was enough to pay Mr. Hinsdale's salary as Court Administrator.

Mr. Wilbers also testified the 1995 sales tax budget had indeed been passed by the Commission, and the budget divided the revenues as follows: "50 percent capital improvement, 25 percent economic development, 10 percent for crime and drug prevention, 5 percent for beautification, and ... 10 percent for housing." Mr. Olson explained the City expected to collect two million dollars in 1995 sales tax revenues, and Mr. Hinsdale's salary as Court Administrator was to be paid out of the money dedicated to crime-related activities. Ms. Giskie confirmed the City was receiving the sales tax revenue. Drawing all inferences in Mr. Hinsdale's favor, Mr. Hinsdale's salary was to be paid out of the $200,000 in sales tax revenue allocated to "crime and drug prevention" in 1995. Because Mr. Hinsdale's Court Administrator salary was approximately $38,000, there was more than enough money to pay his 1995 salary from the budgeted sales tax

revenue. [11] Accordingly, Mr. Hinsdale has presented evidence demonstrating the weakness and implausibility of the reason that insufficient money existed in the City's budgets to pay his salary, and a reasonable factfinder could rationally find this reason unworthy of credence.

Turning to the second interpretation, we conclude the record contains evidence from which a reasonable factfinder could believe the Court Administrator position need not have been listed as a line item in a City budget in order to continue to exist. It appears undisputed the Court Administrator position was not a line item in any of the City's 1995 budgets. *But cf. supra* note 11. However, defendants do not present any state law or city ordinance requiring a position to be listed as a line item on a city budget in order to exist; thus, this presents an issue of fact. In her list of reasons for terminating Mr. Hinsdale, Ms. Giskie wrote the following: "[T]his job is unfunded, and budgets are not bloated enough to hide a $40,000 salary." If it were sufficient to terminate Mr. Hinsdale

---

[11] Exhibit #25 in the record is entitled "Crime Prevention and Alcohol Programs," and appears to be a budget describing how ten percent of the sales tax revenue would be spent. This exhibit shows ten percent of the 1995 sales tax revenue to be $200,000, and includes as a line item in the "Expenditures" section "Court/Community Corrections Adm." in the amount of $41,500. Although Exhibit #25 appears to be the proverbial "smoking gun," we cannot locate anything in the record that explains what this document is or where it came from. Indeed, although the exhibit meshes with Mr. Wilbers' and Mr. Olson's testimony, neither refer to it in those parts of their deposition transcripts in the record on appeal. Accordingly, we do not consider Exhibit #25 in our analysis.

because his position was not listed in any budget, Ms. Giskie would have had no reason to discuss whether she could "hide" his position and salary within one or more of the budgets. Thus, a reasonable factfinder could infer from Ms. Giskie's own statement that she knew listing the position in a budget was not a prerequisite to the position existing, and could rationally find this reason unworthy of credence.

Further, defendants do not claim Messrs. Olson or Wilbers acted *ultra vires* when creating and funding the Court Administrator position in 1994. Mr. Olson testified all the Commissioners agreed to the placement of Mr. Hinsdale in the Court Administrator position. Mr. Wilbers explained this position was not in a 1994 City budget, yet he and Mr. Olson concluded it could be funded out of the general fund. Accordingly, the fact the Court Administrator position existed and was funded in 1994 while not being listed in a 1994 City budget is fundamentally inconsistent with, and contradictory to, any alleged requirement that a position must be listed in a budget to exist, and a reasonable factfinder could rationally find this reason unworthy of credence.

We therefore reverse the district court's summary judgment ruling in favor of defendants as to Mr. Hinsdale's FLSA retaliation claim stemming from his

-23-

termination.

3.  Ms. Giskie and Messrs. Koochel, Bridenburg, and Herrman as Individually Named Defendants

Ms. Giskie and Messrs. Koochel, Bridenburg, and Herrman argue they are entitled to summary judgment in their individual capacities as a matter of law on Mr. Hinsdale's FLSA retaliation claims.  They present this argument in a separate section of their brief, which follows their entire *McDonnell Douglas* analysis. For the sake of convenience and clarity, we also address these arguments separately.

Ms. Giskie argues she is entitled to summary judgment in her individual capacity as a matter of law, because Mr. Hinsdale "himself acknowledged she was 'apologetic' when she informed him of her decision to terminate his employment."  Specifically, she claims Mr. Hinsdale "presents absolutely no evidence to demonstrate a retaliatory animus on her part, nor ... does he call into question the legitimacy of her conclusion that the court administrator position was not funded in the City budget."  We reject these arguments for the same reasons supporting our previous conclusions that Mr. Hinsdale presented sufficient evidence to:  (1) justify an inference of retaliatory motive and thus establish a causal connection between his decision to testify, and actual

testimony, in his wife's FLSA lawsuit and his termination; and (2) create a genuine issue of material fact as to whether defendants' proffered reason for his termination is pretextual. *See supra* Part III.A.2.

Messrs. Koochel, Bridenburg, and Herrman argue they are entitled to summary judgment in their individual capacities on Mr. Hinsdale's FLSA retaliation claims as a matter of law for two reasons: (1) they enjoy absolute legislative immunity "for declining to vote to amend the City's 1995 budget;" and (2) any remarks they made to Mr. Olson and Ms. Giskie "were simply that – remarks," the City Manager makes employment decisions, and "even if it is assumed the three commissioners harbored some retaliatory animus, [Mr.] Hinsdale still cannot establish the causal link necessary to support a prima facie case of FLSA retaliation." [12] We address each argument in turn.

First, the law surrounding legislative immunity is well established in this circuit:

---

[12] Messrs. Koochel, Bridenburg, and Herrman also reiterate an argument they raised within their discussion of the *McDonnell Douglas* analysis: that each of their "legitimate concerns about [Mr.] Hinsdale's job performance" eliminates any potential FLSA retaliation liability. For the reason previously discussed, we again reject their argument. *See supra* note 10.

In order to determine whether Defendants should be cloaked in legislative immunity, we look to the function that the Board members were performing when the actions at issue took place, and we examine the nature of those actions. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct. Further, legislative actions must be done in relation to the business before the legislative body....

....

Not all actions taken at a legislative meeting by a local legislator are legislative for purposes of immunity. Nor does voting on an issue, in and of itself, determine that the act is legislative in nature. Whether actions are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in its character and effect.

*Kamplain v. Curry County Bd. of Comm'rs*, 159 F.3d 1248, 1251-52 (10th Cir. 1998) (citing *Detz v. Hoover*, 539 F. Supp. 532, 534 (E.D. Pa. 1982) for the proposition that "a municipality's employment decisions are 'essentially administrative in nature'") (quotation marks, other citations, and alterations omitted). [13] In this case, Messrs. Koochel, Bridenburg, and Herrman do not provide a record citation for their assertion they "declin[ed] to vote to amend the

---

[13] We note *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), cited by Messrs. Koochel, Bridenburg, and Herrman in support of their argument, and *Kamplain*, cited by Mr. Hinsdale in opposition, are both § 1983 cases. *See Bogan*, 523 U.S. at 47, 54; *Kamplain*, 159 F.3d at 1250. Neither party explains why these cases should apply in a FLSA retaliation lawsuit, a legal issue about which we express no opinion. Because we need not resolve this legal issue to address defendants' argument at this stage in the litigation, we simply assume without deciding that these cases apply.

City's 1995 budget," which means we do not know how they "declin[ed] to vote," to which "1995 budget" they are referring, what the budget process entails, or the significance of declining to amend a budget in general or as it applies to this case. [14] Accordingly, we decline to consider their absolute legislative immunity argument, because there is an insufficiently developed record to allow for a decision. They may raise the argument again on remand to the district court. [15]

Second, Messrs. Koochel, Bridenburg, and Herrman argue Mr. Hinsdale

---

[14] In the statement of facts section of their brief, defendants refer to a January 17, 1995 Commission meeting. During executive session, Ms. Giskie questioned whether the Commission planned to fund the Court Administrator position that "had been placed in the sales tax program," because the position "was not funded in the regular budget for 1995." She testified: "It was the consensus of the commission that they were not going to be making any decisions on the sales tax program until a city manager was on board." In light of Ms. Giskie's delineation between "the regular budget for 1995" and the "sales tax program," this testimony does not support defendants' assertion that they "declin[ed] to vote to amend the City's 1995 budget." To the extent defendants are instead claiming absolute legislative immunity for reaching this "consensus" in executive session on the "sales tax program," defendants again fail to provide us with the factual record necessary to evaluate their argument. For example, we do not know how business is properly brought before the Commission, what exactly a "consensus of the commission" means, or the significance and implications of reaching a "consensus" on a question presented during executive session.

[15] Messrs. Koochel, Bridenburg, and Herrman raised this issue with the district court in both their arguments on Mr. Hinsdale's FLSA retaliation claims and his § 1983 claims, but the district court only addressed it with regard to the § 1983 claims.

-27-

cannot establish the requisite causal link between their alleged retaliatory animus and the adverse employment actions due to the combination of Kan. Stat. Ann. § 12-1014 and *Bullington* . Specifically, they claim § 12-1014 places employment decisions "solely on the shoulders of the city manager," and this court in *Bullington* "refused to hold liable [an] individual defendant who allegedly made retaliatory remarks because he played no part in adverse employment decisions." We conclude this argument is unavailing, because *Bullington* does not include such a holding and is factually distinguishable from this case. [16]

In *Bullington* , the plaintiff brought discrimination and retaliation claims against her employer, United Airlines, under both Title VII and the Age Discrimination in Employment Act. *See Bullington* , 186 F.3d at 1308. Following an unsuccessful interview for a different job within the company, the plaintiff informed the manager of the unit responsible for the decision "of her 'strong concerns' that one of her interviewers ... was biased against her." *Id.* at 1320. The manager then allegedly made retaliatory comments about the plaintiff

---

[16] Accordingly, we assume without deciding that § 12-1014 places authority to make employment decisions "solely on the shoulders of the city manager." *See* Kan. Stat. Ann. § 12-1014 ("The manager shall appoint and remove all heads of departments, and all subordinate officers and employees of the city.... No member of the city commission shall directly interfere with the conduct of any department, except at the express direction of the commission.").

to another employee. *See id.* The plaintiff filed her lawsuit after unsuccessfully interviewing for the position two more times. *See id.* at 1309. Neither the manager nor the employee involved in the alleged retaliatory conversation were among the employees that interviewed the plaintiff. *See id.* at 1320-21. Although the manager selected and supervised the interviewers, this court held "evidence of an opportunity to influence does not amount to evidence of actual influence," and the absence of any evidence the manager "played any part in the adverse employment decisions" means the plaintiff did not establish the requisite causal connection between the protected activity and adverse employment action necessary to establish a prima facie case of retaliation. *Id.*

We start our analysis by noting the only defendant in *Bullington* was United Airlines, which means this court had no occasion to address an individual's liability in a retaliation lawsuit. *See id.* at 1309-10, 1320-21. Messrs. Koochel, Bridenburg, and Herrman thus present no case law to support their theory of individual liability. Further, Mr. Hinsdale does not rely on the mere opportunity Messrs. Koochel, Bridenburg, and Herrman had to influence Mr. Olson and Ms. Giskie. *See, e.g.,* Kan. Stat. Ann. § 12-1011 ("The manager shall be appointed by the commission, and shall hold office at the pleasure of the board."). Rather, Mr. Hinsdale presented evidence of actual efforts by Messrs.

Koochel, Bridenburg, and Herrman to pressure Mr. Olson and Ms. Giskie into demoting and terminating Mr. Hinsdale for his testimony in his wife's FLSA lawsuit. *See supra* Part III.A.2. We conclude this evidence is sufficient at the prima facie stage to show Messrs. Koochel, Bridenburg, and Herrman played a part in the adverse employment decisions, and Mr. Hinsdale has established the requisite causal link.

We therefore conclude Ms. Giskie and Messrs. Koochel, Bridenburg, and Herman are not entitled to summary judgment in their individual capacities as a matter of law with regards to Mr. Hinsdale's FLSA retaliation claims in light of the state of the record on appeal.

B. Mr. Hinsdale's 42 U.S.C. § 1983 Claims [17]

"Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

---

[17] In this section, "defendants" refers to Mr. Koochel, Mr. Bridenburg, Mr. Herrman, Ms. Giskie, and the City.

1.  Freedom of Association

Mr. Hinsdale claims defendants demoted and terminated him in retaliation for the assistance he provided his wife in her FLSA lawsuit, in violation of his First and Fourteenth Amendment right to freedom of association with her. He relies on *Owens v. Rush*, 654 F.2d 1370 (10th Cir. 1981) (hereinafter "*Owens II*"), in which

> we construed [*NAACP v. Button*, 371 U.S. 415 (1963)] as protecting activities involving the assistance of litigation vindicating civil rights. Accordingly, we held that "attending meetings on necessary legal steps" and "associating for the purpose of assisting persons seeking legal redress" are modes of expression and association protected by the First Amendment. Thus we allowed a police officer to pursue a First Amendment claim when he alleged that the sheriff's department fired him because he assisted his wife in filing a sex discrimination claim against the department.

*Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1550 (10th Cir. 1989) (quoting *Owens II*, 654 F.2d at 1379). We held the district court erred in granting the defendants' motion to dismiss when the plaintiff alleged in the operative complaint and pretrial order "he accompanied his wife to her attorney's office; that her Title VII charge was prepared by her attorney, executed and directed for filing; [and] that she was assisted by plaintiff in such matter." *Owens II*, 654 F.2d at 1378-79.

*Copp* identifies "litigation vindicating civil rights" as an essential element

of this type of freedom of association claim. [18] *See Copp*, 882 F.3d at 1550. Grace Hinsdale's lawsuit sought unpaid overtime compensation pursuant to the FLSA, which defendants argue does not meet this element. Mr. Hinsdale responds that FLSA actions are equivalent to Title VII actions, because "both arise from remedial federal legislation designed to protect employees." On the facts of this case, we are unwilling to expand the coverage of "litigation vindicating civil rights" to include Grace Hinsdale's FLSA lawsuit.

We therefore affirm, on a different ground, the district court's decision to grant summary judgment for defendants on Mr. Hinsdale's freedom of association claim.

2. Procedural Due Process

Mr. Hinsdale appeals the district court's grant of summary judgment to

---

[18] The district court concluded it need not determine whether Grace Hinsdale's FLSA lawsuit qualifies as "litigation vindicating civil rights," because it granted summary judgment to Messrs. Koochel, Bridenburg, and Herrman based on absolute legislative immunity, to Ms. Giskie because "no jury question as to causation exists," and to the City because Mr. Hinsdale abandoned his § 1983 claims against it. However, "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (quotation marks omitted).

defendants on his Fourteenth Amendment procedural due process claim regarding the manner in which he was terminated. [19] "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). "In determining whether an individual has been deprived of his [Fourteenth Amendment] right to procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and if so, then (2) was the individual afforded an appropriate level of process." *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994).

The district court assumed Mr. Hinsdale had a protected property interest in continued employment, and held Mr. Hinsdale was "afforded adequate federal procedural due process." Mr. Hinsdale argues he had a protected property interest in continued employment, and the district court erred in holding he received adequate due process when he was terminated. We conclude Mr.

---

[19] Although Mr. Hinsdale lists his demotion as an issue within his Fourteenth Amendment claims in general, he failed to argue this issue in his appellate brief or at oral argument within the context of his procedural due process claim. We conclude he has waived this issue. *See Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1231 (10th Cir. 1990) (holding the plaintiff waived an issue listed in his brief but not argued therein or at oral argument).

Hinsdale did not have a constitutionally protected property interest in continued employment as Court Administrator, and, on this basis, affirm.    *See Sandoval*, 29 F.3d at 542 n.6.

"Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."    *Roth*, 408 U.S. at 577.  In other words, "[property] interests attain ... constitutional status by virtue of the fact that they have been initially recognized and protected by state law."    *Paul v. Davis*, 424 U.S. 693, 710 (1976).

"In the context of a public employee ... the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it."    *Farthing*, 39 F.3d at 1135 (quoting    *Roth*, 408 U.S. at 577). "Protected property interests arise ... from state statutes, regulations, city ordinances, and express or implied contracts.  Such interests may be created by rules or mutually explicit understandings that support Plaintiff's claim of entitlement to the benefit."    *Dill v. City of Edmond*, 155 F.3d 1193, 1206 (10th

Cir. 1998) (quotation marks, citations, and alteration omitted).

In *Farthing* , we extensively reviewed Kansas law regarding public employment in the context of a procedural due process analysis:

[U]nder Kansas law, public employment is presumptively at-will....

In those situations, however, where state law restricts a government employer's removal power by requiring some type of "cause" or "fault" before taking any adverse action against the employee, then the Kansas Supreme Court has declared the employee does possess a protected property interest....

In sum, then, the Kansas Supreme Court has clearly held an at-will employee does not possess a legitimate claim of entitlement in continued employment. The absence of a protected property interest compels the conclusion that the procedural due process safeguards are inapplicable. In contrast, where the employee is terminable only for cause, the Kansas Supreme Court recognizes the employee has a property interest in continued employment under state law. Under those circumstances, the Constitution requires that some level of due process be afforded in order to effectuate a deprivation of this interest.

39 F.3d at 1136. Thus, the issue on appeal is whether Mr. Hinsdale was terminable only for cause. *See id.*

Mr. Hinsdale argues Liberal City Code § 1-406 restricts the City Manager's removal power by requiring "good cause" and "due process" before terminating a City officer or employee in light of § 1-406's plain language and its citation to Kan. Stat. Ann. § 12-1014. Defendants claim: (1) § 1-406 applies only to

officers and employees specifically identified in Article 4 of the City Code,

which does not include the Court Administrator position; and (2) the provision of

§ 12-1014 relied upon by Mr. Hinsdale does not apply to him. Article 4 of the

City Code is entitled "OFFICERS AND EMPLOYEES" and contains § 1-406,

which reads:

> REMOVAL, OFFICERS AND EMPLOYEES. The city manager for good cause may remove any appointive officer[] and employee whose appointment is herein provided. However, no officer or employee may be terminated without due process. (K.S.A. 12-1014; Code 1983)

The appointive positions specifically listed in other sections of Article 4 are the

City Attorney, City Prosecutor, City Clerk, and City Treasurer.


We are guided in our analysis by Kansas case law describing the powers of

a city manager in Kansas, and how such power can be restricted.

> K.S.A. 12-1014 ... does not provide for any term of office for city employees. Additionally, the statute does not place any limitation on the city manager's power to remove an employee from office.... There is no requirement in 12-1014 that a city manager have or give cause before he or she can remove ... a city employee from office.

*Riddle v. City of Ottawa*, 754 P.2d 465, 469 (Kan. Ct. App. 1988).

> The city manager statute provides a comprehensive and all-inclusive form of government for cities that adopt it. It fully covers the field. In the absence of *direct* legislative mandate this court will not deprive the city manager of any power or relieve him from any responsibility the statute places on him.

-36-

*Piper v. City of Wichita*, 258 P.2d 253, 261 (Kan. 1953) (emphasis added).

We conclude § 1-406 does not create a protected property interest in continued employment for Mr. Hinsdale as Court Administrator. Evaluating the plain language of § 1-406, we agree with defendants that the first sentence limits the "good cause" restriction on the City Manager's removal power to those positions "herein provided" – *i.e.*, listed in Article 4.[20] Because "Court Administrator" is not among the listed positions, we conclude the "good cause" restriction does not apply to Mr. Hinsdale's employment at the time of his termination.

We will assume for purposes of this appeal the "due process" requirement in § 1-406 applies to the Court Administrator position, because there is no similar language limiting this requirement to officers or employees "herein provided." "It is well established in this circuit, however, that procedural protections alone do not create a claim of entitlement to continued public employment." *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1129 (10th Cir. 2001); *see Bunger v.*

---

[20] Mr. Hinsdale did not respond to this argument on appeal or in the district court. Even if we were to interpret "herein provided" to mean the entire City Code, Mr. Hinsdale has presented no evidence that the "Court Administrator" position exists in the City Code or is an "appointive" officer or employee position. Liberal City Code § 1-406.

*University of Okla. Bd. of Regents*, 95 F.3d 987, 990-91 (10th Cir. 1996)

(holding plaintiffs may not "attempt[] to construct a property interest out of

procedural timber" (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532,

541 (1985)).  Accordingly, we conclude the "due process" requirement is

insufficient to create a protected property interest, because this requirement does

not limit the reason *why* – *i.e.*, for "cause" or "fault" – an employee can be

terminated; instead, it only limits the *manner* – *i.e.*, with "due process" – in

which an employee can be terminated.  *See Farthing*, 39 F.3d at 1136.  Quite

simply, it is not a sufficiently "direct" legislative mandate to affect the at-will

status of Mr. Hinsdale's employment as Court Administrator.  *Piper*, 258 P.2d at

261; *see Riddle*, 754 P.2d at 469.


Turning to § 1-406's parenthetical citation to Kan. Stat. Ann. § 12-1014,

Mr. Hinsdale argues this simple reference incorporates "for cause" language from

the state statue into § 1-406.  Although Mr. Hinsdale quotes only the second

sentence of the following quote from § 12-1014, we believe the first sentence is

necessary to bring context and meaning to the words used in the second sentence:

> Provided, That if any city operating under the commission form of
> government adopts the city manager form of government, after
> January 1, 1947, and at the time of such adoption has a civil service
> commission, said commission shall have a right to serve out its
> present time and such city shall continue to have a civil service
> commission and such civil service commission shall determine the

merit and fitness of any and every person appointed to any position within the jurisdiction of the civil service commission, as established by the laws of 1913, chapter 88, and acts amendatory thereto: And provided further, That no officer or employee who is under civil service at the time of the adoption of the city manager form of government shall be discharged or removed from the office or position of employment he or she holds at the time of such adoption, except *for cause* , and then only in the manner prescribed by the civil service law in force at the time such removal or discharge is sought.

Kan. Stat. Ann. § 12-1014 (footnote omitted and emphasis added).  Mr. Hinsdale's argument fails for three reasons.  First, he has presented no evidence that the City had a civil service commission at the time it adopted the city manager form of government.  Second, even if a civil service commission existed at that time, he has provided  no evidence that he was employed in a civil service position.  Third, § 1-406's parenthetical citation to § 12-1014 is not sufficiently "direct" to extract out of context the "for cause" phrase and impose it on the Liberal City Manager's ability to take adverse employment action against officers and employees not covered within Article 4.     *Piper* , 258 P.2d at 261;   *see Riddle* , 754 P.2d at 469.


Accordingly, we affirm the district court's decision to grant summary judgment to defendants on Mr. Hinsdale's procedural due process claim.

3. Substantive Due Process

Mr. Hinsdale claims defendants violated his Fourteenth Amendment right to substantive due process, because his demotion and termination were arbitrary and capricious. The district court assumed Mr. Hinsdale had a property interest entitled to the protections of the substantive due process clause, held "there simply is no evidence that either [Mr.] Olson's or [Ms.] Giskie's decisions were arbitrary, capricious or without rational basis," and granted defendants summary judgment on this claim. On appeal, Mr. Hinsdale claims Messrs. Koochel, Bridenburg, and Herrman "clearly abused their power and/or employed it as an instrument of oppression" to have Mr. Hinsdale demoted and terminated. Defendants argue: (1) Mr. Hinsdale's failure to establish a protected property interest for procedural due process purposes dooms his substantive due process claim; and (2) defendants' actions were not "arbitrary or capricious and certainly were not conscience-shocking." We agree with defendants' first argument on appeal, and, on this basis, affirm. *See Sandoval*, 29 F.3d at 542 n.6.

"In order to present a claim of denial of substantive due process by a discharge for arbitrary or capricious reasons, a liberty or property interest must be present to which the protection of due process can attach." *Clinger v. New Mexico Highlands Univ.*, 215 F.3d 1162, 1167 (10th Cir. 2000) (quotation marks

-40-

and citation omitted). "[O]ur circuit precedent does not clearly delineate what specific property interests in employment are fundamental, and thus protected by the doctrine of substantive due process." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1257 (10th Cir. 1998). "In general, we look to state law to determine whether a property interest in employment exists." *Clinger*, 215 F.3d at 1167. We have granted summary judgment for the defendants on both procedural and substantive due process claims where the plaintiff – a city employee – failed to present sufficient evidence to create a genuine issue of material fact as to whether he had a protected property interest under state law. *See Mitchell v. City of Moore*, 218 F.3d 1190, 1198-99 (10th Cir. 2000); *see also Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) ("We established nearly twenty-five years ago that to prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest.").

Based on the structure of Mr. Hinsdale's brief on appeal, it appears he is basing his substantive due process claim on his procedural due process argument that he had a protected property interest in employment pursuant to Liberal City Code § 1-406. Because we concluded above that Mr. Hinsdale does not have a

protected property interest in employment for procedural due process purposes,[21] we conclude his substantive due process claim must fail as well. *See Mitchell*, 218 F.3d at 1198-99; *see also Hyde Park Co.*, 226 F.3d at 1210. Accordingly, we affirm the district court's decision to grant summary judgment to defendants on Mr. Hinsdale's substantive due process claim.

### 4. Equal Protection

The district court concluded Mr. Hinsdale abandoned his equal protection claim by failing to address it in his response to defendants' motion for summary judgment. Mr. Hinsdale concedes he failed to address the claim in his memorandum opposing summary judgment, but blames his failure on the local district court rule limiting the length of memoranda supporting or opposing summary judgment to twenty-five pages and the district court's denial of his motion to exceed the page limitation. In *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388 (10th Cir. 1992), we expressly rejected the plaintiff's argument that a "page limitation placed on his brief in the district court" excused his failure to

---

[21] Although Mr. Hinsdale addresses his demotion in his substantive due process claim, he does not argue on appeal that he had a protected property interest in continued employment as Chief of Police. *See supra* note 19. Nonetheless, for the reasons discussed above regarding his procedural due process claim and the scope of Liberal City Code § 1-406, we conclude Mr. Hinsdale did not have a constitutionally protected property interest in continued employment as Chief of Police. *See supra* Part III.B.2.

-42-

challenge or rebut the defendants' arguments in their summary judgment motion. *Id.* at 1393. We held this failure "is fatal to his attempt to raise and rebut such arguments on this appeal." *Id.* Accordingly, we affirm the district court's decision to grant summary judgment for defendants on Mr. Hinsdale's equal protection claim.

### 5. Claims Against the City

The district court concluded Mr. Hinsdale abandoned his § 1983 claims against the City by failing to address them in his response to defendants' motion for summary judgment. Mr. Hinsdale again concedes he failed to address defendants' arguments in his memorandum opposing summary judgment, but claims the failure to respond is excusable due to: (1) defendants' failure to raise the arguments as a "separate issue" and that it was merely a "conclusory, three sentence paragraph within their arguments;" and (2) the local rule limiting the length of his opposition brief.

First, on summary judgment, defendants, as movants who will not carry the burden of persuasion at trial, made an argument why summary judgment is appropriate as to a particular claim, which shifted the burden to Mr. Hinsdale, as nonmovant. *See Adler*, 144 F.3d at 670-71. Mr. Hinsdale's failure to respond is

fatal to his claims. *See id.* at 670. Second, *Coffey* disposes of Mr. Hinsdale's second argument for the reasons discussed above. *See supra* Part III.B.4.

We therefore affirm the district court's decision to grant summary judgment for the City as to Mr. Hinsdale's § 1983 claims.

6. Conclusion

Because we affirm the district court's decision to grant defendants summary judgment on each of Mr. Hinsdale's § 1983 claims on appeal, we need not address Mr. Hinsdale's argument that Messrs. Koochel, Bridenburg, and Herman are not entitled to absolute legislative or qualified immunity, and Ms. Giskie is not entitled to qualified immunity, as to these claims. *See Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir.), *cert. denied*, 502 U.S. 878 (1991) ("We will not undertake to decide issues that do not affect the outcome of a dispute.").

C.  42 U.S.C. § 1985(2) and (3) Claims  [22]

Mr. Hinsdale claims defendants  [23]  conspired in violation of 42 U.S.C. § 1985(2) and (3) to terminate his employment because of his decision to testify, and actual testimony, in his wife's FLSA lawsuit.  The existence of a conspiracy is an essential element of a cause of action under both subsections (2) and (3) of § 1985.  *See Tilton v. Richardson*, 6 F.3d 683, 685-86 (10th Cir. 1993) (§1985(3)), *cert. denied*, 510 U.S. 1093 (1994); *Abercrombie*, 896 F.2d at 1230 (§1985(2)).  A civil conspiracy requires a meeting of the minds or agreement among the defendants and concerted action.  *See Abercrombie*, 896 F.2d at 1230-31.  The district court held Mr. Hinsdale "has not produced sufficient evidence of the existence of a conspiracy between [Messrs.] Koochel, Bridenburg, and Herrman," and "offered no evidence that [Ms.] Giskie was a member of the conspiracy."  We agree with the district court.

---

[22]  Mr. Hinsdale argues he raised § 1985 claims under both subsections (2) and (3) in his opposition to defendants' summary judgment motion, and that his complaint and the pretrial order may be reasonably interpreted to bring both causes of action.  We agree, and, therefore, reject defendants' argument that Mr. Hinsdale is raising a § 1985(2) claim for the first time on appeal.  Although the district court addressed Mr. Hinsdale's conspiracy claim under subsection (3), its holding equally disposes of a claim under subsection (2).  *See infra* Part III.C.  Accordingly, we address both claims pursuant to our de novo review.

[23]  In this section, "defendants" refers to Mr. Koochel, Mr. Bridenburg, Mr. Herrman, and Ms. Giskie.

On appeal, Mr. Hinsdale claims "[a] conspiracy is shown, since no single Commissioner had the political clout or legal authority to terminate [Mr.] Hinsdale on his own." According to Mr. Hinsdale, the combination of Messrs. Koochel, Bridenburg, and Herrman's vote to terminate Mr. Olson and the individual pressure each applied on Ms. Giskie to terminate Mr. Hinsdale evidences a conspiracy amongst the four. We conclude this is insufficient to create a genuine issue of material fact as to whether a conspiracy existed.

First, as discussed *supra* Part III.A.2 and note 9, Mr. Hinsdale concedes only Mr. Koochel wanted to terminate Mr. Olson for his refusal to terminate Mr. Hinsdale. In contrast, Messrs. Bridenburg and Herrman had their own separate, personal reasons for voting to terminate Mr. Olson. Second, Mr. Hinsdale points to no evidence in the record of an agreement or concerted action by Messrs. Koochel, Bridenburg, and Herrman to seek his termination; each approached either Mr. Olson or Ms. Giskie individually with his desire to see Mr. Hinsdale terminated. *Cf. Abercrombie*, 896 F.2d at 1231 ("Without any evidence of communication between [the defendants], there is nothing to give rise to the inference that they conspired."). Third, Mr. Hinsdale does not challenge on appeal the district court's conclusion that he "offered no evidence that [Ms.] Giskie was a member of the conspiracy."

Accordingly, we affirm the district court's decision to grant summary judgment to defendants on Mr. Hinsdale's § 1985 claims.

D. Grace Hinsdale's § 1983 Freedom of Association Claim

Grace Hinsdale claims defendants [24] demoted and terminated her husband in retaliation for her FLSA lawsuit against the City, in violation of her First and Fourteenth Amendment right to freedom of association with him as defined in *Owens II*. Essentially, she argues: "If Tom Hinsdale's right of association was violated, her's [sic] was also." The district court granted defendants summary judgment on this claim, because: (1) Grace Hinsdale's "derivative claim[]" did not survive summary judgment for defendants on her husband's freedom of association claim; and, in the alternative, (2) Grace Hinsdale failed to establish an "injury in fact" and thus does not have standing to pursue her claim. On appeal, Grace Hinsdale only challenges the district court's conclusion she does not have standing. Having failed to challenge the district court's first holding, we deem the issue waived. [25] *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d

---

[24] In this section, "defendants" refers to Mr. Koochel, Mr. Bridenburg, Mr. Herrman, Ms. Giskie, and the City.

[25] We do, however, note *Owens II* does not provide a cause of action for the litigating spouse, but rather only one for the assisting spouse. *See Copp*, 882 F.2d at 1550; *Owens II*, 654 F.2d at 1378-79. As for the litigating spouse in *Owens II*, who was also discharged from employment with the sheriff's department, this court stated she

979, 984 n.7 (10th Cir. 1994) ("[A]ppellant failed to raise this issue in his opening brief and, hence, has waived the point."). Thus, we need not address her standing argument. *See Griffin*, 929 F.2d at 554.

We therefore affirm the district court's decision to grant summary judgment for defendants on Grace Hinsdale's freedom of association claim.

## IV. Conclusion

We **REVERSE** the district court's decision to grant summary judgment for Mr. Koochel, Mr. Bridenburg, Mr. Herrman, Ms. Giskie, and the City on Mr.

---

"could possibly have presented a colorable § 1983 claim . . . for discharge for exercising First Amendment rights." *Owens II*, 654 F.2d at 1373, 1378; *see Owens v. Rush*, 636 F.2d 283, 285 (10th Cir. 1980) (hereinafter "*Owens I*"). Thus, we did not open the door to a claim by the litigating spouse based solely on the assisting spouse's freedom of association claim. Finally, to the extent Grace Hinsdale is trying to bring the type of claim identified in *Owens II* for the litigating spouse, the record is devoid of any claim or evidence that she was discharged from employment by the City because of her FLSA lawsuit.

Hinsdale's FLSA retaliation claims, **AFFIRM** the district court's decision in all other respects, and **REMAND** for proceedings consistent with this Order and Judgment.

           **Entered by the Court:**

           **WADE BRORBY**
           United States Senior Circuit Judge